## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

GEORGE W. KROHMER,        )
                              )
        Plaintiff,           )
                              )     2:17-cv-01239
             v.            )
                              )
AMERICAN AIRLINES, INC.,    )
                              )
        Defendant.        )

### OPINION

**Mark R. Hornak, Chief United States District Judge**

      Plaintiff George Krohmer was fired from his job at American Airlines. He alleges that in doing so, American Airlines discriminated against him in violation of Title VII of the Civil Rights Act and the Americans with Disabilities Act ("ADA") because he is gay and he has AIDS. Plaintiff further alleges that Defendant terminated his employment in retaliation for his engaging in protected activity under Title VII and the ADA, and for taking leave under the Family and Medical Leave Act ("FMLA"). Pending before the Court is a Motion for Summary Judgment filed by Defendant. (ECF No. 52.) For the reasons that follow, Defendant's Motion will be GRANTED in part and DENIED in part.

### I.   FACTUAL BACKGROUND[1]

      The following material facts are undisputed unless otherwise noted.[2]

---

[1] In some instances, Plaintiff admits Defendant's stated facts but then says they are "incomplete," and adds additional material, denials of unstated facts, and improper legal conclusions. These types of responses contravene the Western District of Pennsylvania's Local Rule LCvR 56(C)(1), which instructs the party opposing a Motion for Summary Judgment to admit or deny each fact set forth in the movant's Concise Statement and explain denials of the movant's stated facts. This Rule does not authorize nonmovants to explain denials of other, unstated facts or "inferences." For the sake of efficiency, the Court will not note each instance where this occurs and the additional material does not respond to the fact as stated, but will address additional facts asserted by Plaintiff that raise material factual issues.

[2] The facts are taken from the evidence of record that is either undisputed as indicated by the parties, or not fairly disputed on the record. Disputed facts are viewed in the light most favorable to the nonmoving party in accordance with *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). For efficiency, the Court omits separate citations to Plaintiff's Response to Defendant's Concise Statement of Material Facts (ECF No. 62) where Plaintiff clearly admits

## A.     Employment at American Airlines

Defendant maintains a Crew Resources Department that is responsible for, among other things, scheduling pilot and flight attendant crews. (Defendant's Concise Statement of Material Facts ("DSMF"), ECF No. 54 ¶ 1.) Defendant hired Plaintiff as a pilot crew scheduler in 2007. (*Id.* ¶ 2.) In 2008, Plaintiff was transferred from Phoenix, Arizona, to the Pittsburgh Operation Control Center ("OCC") to continue his work as a crew scheduler. (Plaintiff's Concise Statement of Material Facts ("PSMF"), ECF No. 63 ¶ 2.) As a crew scheduler, Plaintiff reported to various pilot crew supervisors who in turn reported to Crew Resources Manager David Buterbaugh. (DSMF ¶¶ 4–5.) Mr. Buterbaugh reported to the Director of Crew Resources. (*Id.* ¶¶ 6–7.) Mr. Steve Holliday became the Director of Crew Resources in 2013. (*Id.* ¶ 7.) Prior to his 2013 promotion, Mr. Holliday was the Manager of System Crew Scheduling for at least ten years. (PSMF ¶ 7.) The Pittsburgh OCC did not have an onsite Human Resources ("HR") department to assist with personnel matters. (*Id.* ¶ 13.) Instead, the Pittsburgh OCC partnered with an HR Business Manager who was not physically located in the OCC. (*Id.*) Between 2012 until April 2014, Ms. Amber Sanders was the HR Business Manager assigned to the Pittsburgh OCC. (*Id.* ¶ 14.) Ms. Julie Szumski was the subsequent HR Business Manager. (*Id.* ¶ 15.)

## B.     Plaintiff's Documented History of Disciplinary Problems at American Airlines

During his tenure with American Airlines, Plaintiff was counseled by supervisors about his workplace conduct and professionalism on at least five documented occasions:

> 1.   In February 2009, Mr. Buterbaugh counseled Plaintiff about his lack of professionalism on a telephone call with one of the Company's pilots. (DSMF ¶ 9.)

---

to a fact contained in Defendant's Concise Statement of Material Facts. Similarly, the Court omits separate citations to Defendant's Response to Plaintiff's Concise Statement of Material Facts (ECF No. 70) where Defendant clearly admits to a fact contained in Plaintiff's Concise Statement of Material Facts. The Court further omits duplicative citations to both parties' statements of facts where the parties allege identical facts.

Plaintiff admitted at the time that he was rude to the pilot and told Mr. Buterbaugh that he was working to correct his behavior. (*Id.* ¶ 10; George Krohmer Deposition ("Krohmer Dep."), ECF No. 64-2, at 139:9–140:2.) During his deposition in this case, Plaintiff testified that he didn't remember what he did that was rude. (Krohmer Dep., at 139:14–16.)

2. In November 2009, Mr. Buterbaugh counseled Plaintiff after a coworker reported that she felt threatened by Plaintiff and felt that he was acting in an unprofessional and hostile manner. (DSMF ¶ 11; ECF No. 55-2, at 79.)

3. In January 2012, American Airlines suspended Plaintiff for issues relating to his professionalism in the workplace. (DSMF ¶ 13.)

4. In October 2013, American Airlines issued a "final" disciplinary warning to Plaintiff, which cautioned Plaintiff that "any further infractions, including inappropriate behavior in the work environment could result in the termination of [his] employment." (*Id.* ¶¶ 14–15.)

5. In September 2014, American Airlines issued another "final" warning to Plaintiff after Mr. Buterbaugh concluded that Plaintiff had been discourteous and unprofessional to a vendor hotel manager. (*Id.* ¶ 16.) This warning encouraged Plaintiff to "take all steps necessary to bring [his] conduct in line with [American Airlines's] standards and expectations" and warned him that "[a]ny further infractions, including unprofessional behavior, may result in the termination of [his] employment." (*Id.* ¶ 17.)

Plaintiff had no further disciplinary actions taken against him from September 10, 2014 until June 2015. (PSMF ¶ 44.) On March 13, 2015, however, Mr. Holliday contacted HR Manager

Szumski about one of Plaintiff's Facebook posts that Mr. Holliday thought was related to a minor workplace dispute between Plaintiff and a coworker. (PSMF ¶ 87; Steve Holliday Deposition, "Holliday Dep.," ECF No. 64-6, at 88:14–93:23.) In the email, Mr. Holliday admitted that he could not prove that the Facebook post involved anything to do with work, but he commented, "you know the issues we have with [Plaintiff]." (PSMF ¶ 88.) Mr. Holliday testified that it was unusual for someone to forward him information relating to an employee's Facebook post. (PSMF ¶ 87; Holliday Dep., at 93:01–23.)

### C.   Plaintiff's Termination

#### 1.   Alleged Events

From June 1–10, 2015, a newly hired crew scheduler, Ms. Opal Corrica, shadowed Plaintiff for on-the-job training. (DSMF ¶ 18.) On June 16, 2015, Ms. Corrica emailed a complaint to her supervisor, Ms. Sharon Walker, alleging that Plaintiff made inappropriate comments to her during that training period. (*Id.* ¶ 19; PSMF ¶ 58.) In her complaint, Ms. Corrica reported, among other things, that Plaintiff: (1) stated that he and his partner "will SEXtime every evening," as opposed to Facetime; (2) referred to another employee as an "ax murderer" and made "stabbing motion[s] with [his] hand" when the employee would walk by; (3) referred to another employee as having "a preference for transvestites and [being] in the closet"; (4) stated that another employee "needs [sexual] action or a dildo"; (5) suggested that Ms. Corrica have a "mold or impression taken of [her] male companion's genital area and an adult novelty toy created from [the] impression"; and (6) used an "[e]scalated voice and "bark[ed]" at Ms. Corrica while providing instruction. (DSMF ¶ 20; ECF No. 55-3, at 55.)

4

Upon receipt of Ms. Corrica's complaint, Ms. Walker informed Mr. Buterbaugh of the allegations. (DSMF ¶ 21.) Mr. Buterbaugh then informed Mr. Holliday of the allegations, and Mr. Holliday asked the HR Department to send someone to investigate. (*Id.*)

### 2. Ms. Jeanette Gibbs's Investigation

American Airlines suspended Plaintiff with pay pending its investigation into Ms. Corrica's allegations. (*Id.* ¶ 22.) American Airlines assigned an HR senior specialist, Ms. Gibbs, to investigate. (*Id.* ¶ 23.) Plaintiff and Ms. Gibbs had not met before she was assigned to investigate Ms. Corrica's allegations. (*Id.* ¶ 25.) At the time of Ms. Gibbs's investigation into Ms. Corrica's allegations, Ms. Gibbs was unaware that Plaintiff has AIDS or had filed previous discrimination complaints against managers and supervisors in the Pittsburgh OCC. (*Id.* ¶ 26; PSMF ¶ 70; Jeanette Gibbs Deposition, "Gibbs Dep.," ECF No. 64-5, at 158:18–161:7.) Ms. Gibbs testified that she did not learn that Plaintiff has AIDS until she was told during her deposition in this case. (Gibbs Dep., at 161:3–161:7.) Ms. Gibbs testified that her investigation included reviewing Plaintiff's personnel file. (*Id.* at 159:16–22.)

Ms. Gibbs interviewed Ms. Corrica on three separate occasions and Plaintiff on two separate occasions. (DSMF ¶¶ 27–28; PSMF ¶¶ 65–66.) Ms. Gibbs interviewed 19 other Crew Scheduling employees in addition to Ms. Corrica and Plaintiff. (DSMF ¶ 29.) Ms. Gibbs determined on her own who to interview and what questions to ask without input from Mr. Holliday or Mr. Buterbaugh. (*Id.* ¶ 30.) Ms. Corrica reported to Ms. Gibbs that she took notes in her diary about events that occurred in the workplace, but Ms. Gibbs refused to provide a copy of the diary to Ms. Gibbs. (PSMF ¶ 67; Gibbs Dep., at 58:21–59:19.) Ms. Gibbs did not take any action to force Ms. Corrica to produce her diary. (Gibbs Dep., at 91:08–92:10.)

In addition to the allegations set forth above, Ms. Corrica made the following allegations against Plaintiff: (1) Plaintiff said that he was looking forward to leaving Pittsburgh and that once he left, he would call his coworkers and tell them, "Fuck you"; (2) Plaintiff suggested that Ms. Corrica purchase a dildo as a gift for her training instructor who Plaintiff said had not had sex in years; (3) Plaintiff called another coworker "delusional"; and (4) Plaintiff told Ms. Corrica that American Airlines couldn't do anything to him even though he has disciplinary letters in his file because his boyfriend held a prominent government job and because Plaintiff was seeing a "quack" doctor. (DSMF ¶¶ 31–37.)

Plaintiff denies all of Ms. Corrica's allegations. (*Id.* ¶ 43.) And there were no third-party witnesses to any of the alleged actions or statements by Plaintiff. (*Id.*) Ms. Gibbs testified that she did not remember if she asked Ms. Corrica if she had told Plaintiff that his alleged comments offended her. (Gibbs Dep., at 125:24–128:3.) Plaintiff raised his own allegations against Ms. Corrica after he was under investigation. (DSMF ¶ 55.) In addition, Plaintiff testified that, prior to Ms. Corrica's allegations, he had asked a Crew Scheduler to place Ms. Corrica with another trainer. (Krohmer Dep., at 217:8–218:10.)

Ms. Gibbs asked each employee interviewed to sign a confidentiality agreement agreeing not to discuss any matters relating to the investigation. (PSMF ¶ 60.) Ms. Gibbs investigated Plaintiff for a possible breach of his confidentiality agreement after he circulated an online mugshot of Ms. Corrica to several of their coworkers. (DSMF ¶ 51; PSMF ¶ 71.)[3] Ms. Gibbs took no action when she learned that Ms. Corrica had asked another coworker if she had been contacted by Mr. Holliday about the investigation. (PSMF ¶ 72.)

---

[3] Mr. Buterbaugh admitted that he and other employees had separately searched for and viewed at work Ms. Corrica's mugshot. (David Buterbaugh Deposition, "Buterbaugh Dep.," ECF No. 64-4, at 154:23–156:05.)

Ms. Gibbs interviewed employees about Ms. Corrica, some of whom had negative things to say about her. (DSMF ¶ 54.) Employees reported that Ms. Corrica was "crazy" and "paranoid." (*Id.*) Multiple employees also said that they were uncomfortable working with Ms. Corrica. (PSMF ¶ 74.) Plaintiff and one other employee reported to Ms. Gibbs that Ms. Corrica expressed a preference for "Aryan" men. (*Id.* ¶ 78; Defendant's Response to PSMF, ECF No. 70 ¶ 78; Gibbs Dep., at 95:24–96:23, 96:20–98:12.) And another employee reported to Ms. Gibbs that she was told that Ms. Corrica preferred Aryan men and that Ms. Corrica only wanted to work with Plaintiff. (PSMF ¶ 79.) Ms. Gibbs also reported that Ms. Corrica showed Plaintiff and possibly other coworkers a photograph of herself in a bathing suit with a celebrity. (*See* ECF No. 64-5, at 68.)

At the end of her investigation, Ms. Gibbs produced a 24-page Investigation Summary that she provided to Mr. Holliday. (DSMF ¶¶ 39–40.) Ms. Gibbs did not offer her opinion on whether Ms. Corrica's complaints should be credited. (PSMF ¶ 77; Gibbs Dep., at 154:4–158:6; Holliday Dep., at 148:7–10.)

### 3.   Mr. Holliday's Decision

Mr. Holliday was the sole decisionmaker as to Plaintiff's termination. (DSMF ¶ 58; Gibbs Dep., at 144:7–145:24; Holliday Dep., at 147:17–22.) On June 25, 2015, Mr. Holliday sent an email to HR Manager Szumski that stated that he was not "prejudging" but that a new hire (Ms. Corrica) had come forward with "serious issues" about Plaintiff and that the involved comments were "very offensive." (PSMF ¶ 89.)

Mr. Holliday considered and relied upon Ms. Gibbs's Investigation Summary. (DSMF ¶ 41.) Mr. Holliday also personally sat in on all of Ms. Gibbs's interviews with Ms. Corrica and Plaintiff, as well as some interviews with other employees. (*Id.* ¶ 42.) At least three employees reported to Ms. Gibbs that Ms. Corrica had contemporaneously complained to them that Plaintiff

made inappropriate comments to Ms. Corrica when she was shadowing Plaintiff, though none of these employees overheard or witnessed Plaintiff making such comments. (*Id.* ¶ 49; Plaintiff's Response to DSMF, ECF No. 62 ¶ 49; ECF No. 64-5, at 54–55.) Crew Scheduler Mansuo Bouquia reported to Ms. Gibbs that Ms. Corrica told him about Plaintiff's comment suggesting that a training instructor get a dildo. (DSMF ¶ 50.) Mr. Bouquia told Ms. Gibbs that when he confronted Plaintiff about the comment, Plaintiff would not admit or deny making it. (*Id.*)[4] During Ms. Gibbs's investigation, Crew Scheduler Renee McConnell reported that she was not surprised by Ms. Corrica's allegations because she witnessed similar conduct from Plaintiff, including Plaintiff making sexual comments. (*Id.* ¶ 45; ECF No. 65-5, at 62–63.) Ms. McConnell reported to Ms. Gibbs that Plaintiff told her about "Naked Mondays" he and his boyfriend have together. (DSMF ¶ 46.)[5]

In addition, Mr. Holliday recalled that before he became the Director of Crew Scheduling someone told him that Plaintiff had told a coworker that Plaintiff had been arrested in another state for performing oral sex on another man in a car. (*Id.* ¶ 44.)[6] Mr. Holliday did not recall who told him about this alleged comment, and he never asked Plaintiff about it. (PSMF ¶¶ 96–97.)

As stated, no third-party witnesses reported hearing or observing Plaintiff's alleged comments to Ms. Corrica, and Plaintiff denies making any such comments. (DSMF ¶ 43.) But Mr. Holliday testified that he determined that Ms. Corrica's allegations were credible. (Holliday Dep.,

---

[4] Plaintiff testified that his recollection of his conversation with Mr. Bouquia was that Mr. Bouquia told Plaintiff to watch himself around Ms. Corrica. (Krohmer Dep., at 201:02–18.) However, Plaintiff does not dispute that Mr. Bouquia's version of the conversation was what was included in the investigative report. (*See* ECF No. 64-5, at 54.)

[5] In his deposition, Plaintiff admitted that he made the "Naked Mondays" comment to Ms. McConnell, but he testified that he did so in 2014 at a party outside of work. (Krohmer Dep., at 204:2–20.) However, Plaintiff does not dispute that Ms. McConnell reported this comment to Ms. Gibbs in an investigative interview and that it was included in the investigative report. (*See* ECF No. 64-5, at 62–63.)

[6] Plaintiff disputes the underlying event and disputes that he ever told anyone that such occurred, but he does not dispute that Mr. Holliday was told about this comment.

at 149:5–14.) Mr. Holliday testified that the factors that contributed to his conclusion that Ms. Corrica's allegations were credible included: that Mr. Holliday believed Plaintiff previously made comments at work that Mr. Holliday considered sexually inappropriate; that Plaintiff had previously been disciplined for a lack of professionalism; that, according to Ms. Gibbs's Investigative Summary, multiple employees confirmed that Ms. Corrica had contemporaneously complained during her training that Plaintiff was making inappropriate comments; and that Ms. McConnell reported to Ms. Gibbs that Plaintiff had made sexually inappropriate comments to her. (DSMF ¶ 57; Holliday Dep., at 193:1–199:23.) In addition, Mr. Holliday concluded that Plaintiff's circulation of Ms. Corrica's mugshot was both disparaging to Ms. Corrica and an attempt to undermine the integrity of the Company's investigation. (DSMF ¶ 52.) Mr. Holliday testified that Plaintiff's circulation of the mugshot was not a determinative factor in the decision to terminate Plaintiff's employment and had Plaintiff not engaged in that behavior Mr. Holliday still would have terminated his employment based on the inappropriate comments Plaintiff allegedly made to Ms. Corrica. (*Id.* ¶ 53.)

Mr. Holliday terminated Plaintiff's employment on July 22, 2015. (*Id.* ¶ 59.) Plaintiff denied all of Ms. Corrica's allegations against him but agreed during his deposition that his termination would have been warranted if he had in fact engaged in the conduct Ms. Corrica alleged. (*Id.* ¶ 60; Krohmer Dep., at 245:13–16.) Plaintiff testified that the situation was a "he said/she said" situation and asserted that Mr. Holliday was "wrong" in crediting Ms. Corrica's allegations and not crediting Plaintiff's denials. (DSMF ¶ 61; Krohmer Dep., at 245:17–20, 247:8–11.) Plaintiff testified that Mr. Holliday did not make "the right call." (DSMF ¶ 62.)

### 4.   Ms. Corrica's Termination

Shortly after Plaintiff's termination, in August 2015, American Airlines relocated the Crew Resources Department and all of the crew scheduling employees who elected to remain in their roles from Pittsburgh to Dallas, Texas. (*Id.* ¶ 89.) Mr. Holliday declined to relocate to Dallas and had no management oversight of the Crew Resources Department after August 2015. (*Id.* ¶ 90.) In February 2016, a Crew Scheduler in Dallas, Ms. Angela Hill, alleged that Ms. Corrica threatened her. (*Id.* ¶ 92.) Following this incident, American Airlines suspended Ms. Corrica on February 27, 2016, which was about seven months after Plaintiff was discharged. (*Id.* ¶ 93.) HR professionals investigated Ms. Hill's allegations by interviewing Ms. Hill and seven additional coworkers of Ms. Hill and Ms. Corrica. (*Id.* ¶ 94.) Ms. Gibbs was not involved in the investigation into the allegations against Ms. Corrica. (*Id.* ¶ 95.) Ms. Corrica denied any inappropriate or unprofessional behavior in the workplace. (*Id.* ¶ 97.)

After the conclusion of the investigation into Ms. Corrica, the Dallas-based Managing Director concluded that Ms. Corrica had been rude, unprofessional, and threatening. (*Id.* ¶ 98.) The Managing Director terminated Ms. Corrica's employment on May 24, 2016. (*Id.*) Mr. Holliday was not involved in the investigation or the decision to terminate Ms. Corrica's employment. (*Id.* ¶ 99.) It was not until his September 12, 2018 deposition in this case that Mr. Holliday became aware that American Airlines had terminated Ms. Corrica's employment. (*Id.* ¶ 100.)

### D.   <u>Plaintiff's Sexual Orientation, Disability, and His FMLA Leave</u>

Plaintiff identifies as gay. (*Id.* ¶ 63.) In March 2013, Plaintiff was diagnosed with AIDS. (*Id.* ¶ 64.) Plaintiff subsequently told a half-dozen coworkers about his diagnosis. (*Id.* ¶ 67.) One of the coworkers who Plaintiff told about his diagnosis relayed that information to Mr. Buterbaugh. (*Id.* ¶ 68.)

On March 19, 2013, Mr. Buterbaugh called Plaintiff into a conference room and questioned Plaintiff about whether he had been diagnosed with AIDS. (PSMF ¶ 17.) Though Plaintiff wanted to speak to the person who revealed to Mr. Buterbaugh that Plaintiff has AIDS, Mr. Buterbaugh continued to question Plaintiff about whether it was true that he has AIDS. (*Id.* ¶ 19.) Mr. Buterbaugh ultimately asked Plaintiff at least a dozen times if he had been diagnosed with AIDS. (*Id.* ¶ 20–21.) Plaintiff was offended by Mr. Buterbaugh's questioning, which he characterized as an "interrogation," and testified that he experienced an "emotional breakdown." (DSMF ¶ 70; PSMF ¶ 22; Krohmer Dep., at 50:24–52:5.) Plaintiff finally disclosed to Mr. Buterbaugh that he had been diagnosed with AIDS and asked Mr. Buterbaugh to keep his AIDS diagnosis confidential. (PSMF ¶ 22.) Mr. Buterbaugh subsequently disclosed Plaintiff's diagnosis to HR Manager Sanders and Mr. Holliday. (*Id.* ¶¶ 26–27.) Plaintiff testified that Mr. Buterbaugh did not speak to Plaintiff after this incident except regarding disciplinary actions. (Krohmer Dep., at 37:1–17, 75:14–25.) Within approximately one month of Mr. Buterbaugh's questioning of Plaintiff, at least ten employees approached Mr. Buterbaugh with concerns that Plaintiff was wearing a surgical mask that appeared to have blood on it. (PSMF ¶ 28.)

Other than Mr. Buterbaugh's inquiry into Plaintiff's AIDS diagnosis, Plaintiff did not identify any specific comment that he found offensive made by a Company supervisor or manager about the fact that he is gay or has AIDS. (DSMF ¶¶ 65–66; Plaintiff's Response to DSMF ¶¶ 65–66.)[7] There were other gay crew schedulers who reported up to Mr. Holliday. (DSMF ¶ 78.) Plaintiff does not allege that American Airlines discriminated against any of the other gay crew schedulers. (*Id.* ¶ 79.)

---

[7] However, Plaintiff testified that one coworker had made comments prior to March 2013 about his sexual orientation that he perceived to be negative (Krohmer Dep., at 84:10–85:5), and that another coworker, who is also gay, made comments that Plaintiff found "uncalled for" (*id.* at 86:2–87:12). But he did not remember any specific comments. (*See id.* at 84:10–87:23.)

Plaintiff took FMLA leave both before and after his AIDS diagnosis. (DSMF ¶ 72.) Plaintiff submitted 15 or more applications for FMLA leave during his employment. (*Id.* ¶ 73.) American Airlines granted all of his applications for FMLA leave. (*Id.* ¶ 74.)[8] No one in management ever made a negative comment to Plaintiff about his FMLA usage. (*Id.* ¶ 76.) On August 7, 2013, Plaintiff sent an email to Mr. Buterbaugh and HR Manager Sanders complaining that Plaintiff's supervisor accused him of job abandonment when he left work early due to illness even though he was approved for intermittent FMLA leave. (PSMF ¶ 34.) He was cleared of any wrongdoing and not disciplined. (Krohmer Dep., at 65:22–68:2.) The last time that Plaintiff took FMLA leave was in the spring of 2015. (DSMF ¶ 77.) Plaintiff does not know which of his coworkers had disabilities or took FMLA leave. (*Id.* ¶ 80.)

### E.   Protected Activity

#### 1.   Prior EEOC Charges

On March 24, 2013, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that Mr. Buterbaugh inquired about his AIDS diagnosis and that American Airlines changed his department seniority date. (*Id.* ¶ 81.)

On January 29, 2014, Plaintiff filed a charge of discrimination with the EEOC, alleging that American Airlines discriminated against him because of his gender, sexual orientation, and disability, and retaliated against him for filing his earlier charge when it selected another candidate for a job to which Plaintiff applied. (*Id.* ¶ 82.)

---

[8] Plaintiff disputes this as stated. (*See* Plaintiff's Response to DSMF ¶ 74.) As discussed, on August 7, 2013, Plaintiff sent an email to Mr. Buterbaugh and HR Manager Sanders complaining that Plaintiff's supervisor accused him of job abandonment when he left work early due to illness even though he was approved for intermittent FMLA leave. But Plaintiff admits that even though he was accused of job abandonment, he was eventually permitted to take FMLA leave. (*See id.* ¶ 75; *see also* Krohmer Dep., at 65:22–68:2.)

On September 3, 2014, Plaintiff filed a third charge of discrimination with the EEOC, alleging that American Airlines discriminated against him because of his national origin, gender, sexual orientation, and disability, and retaliated against him for filing two prior charges, by not selecting him to another position to which he applied. (*Id.* ¶ 83.)

All three of the EEOC charges were resolved without court litigation. (Krohmer Dep., at 88:3–90:13, 114:21–115:24, 124:4–13.) Mr. Holliday was aware that Plaintiff agreed to settle the first two Charges of Discrimination that he filed in return for American Airlines's agreement to restore Plaintiff's seniority date to October 8, 2007. (PSMF ¶ 40.) Although Plaintiff received a right to sue letter as to the second and third charges, he did not file a lawsuit about them. (Krohmer Dep., at 114:21–115:24, 124:4 – 13.)

### 2.  Internal Complaints

#### a.  *General Complaints*

Plaintiff also filed multiple internal complaints with American Airlines, some of which implicated his disability and/or sex, and others that didn't. These complaints included: a March 2013 ethics complaint about Mr. Buterbaugh's inquiry into his AIDS diagnosis; an April 2013 complaint expressing concern that Mr. Buterbaugh was spreading information about his personal medical condition and disability to others; a May 2013 complaint that Mr. Buterbaugh was "stern, dominating, and intimidating" when he declined to give Plaintiff bid rosters that Plaintiff requested and that Mr. Buterbaugh had made Plaintiff feel "unwelcome" and bullied ever since Mr. Buterbaugh "interrogated" Plaintiff about his medical status; June and July 2013 complaints that people were "snickering" at him; and an August 2013 complaint that he had not received an $8 Chick-Fil-A gift card after a group contest, calling it "a blatant showcase" of singling him out and

of discrimination because he is gay, protected by the ADA, is Latin, and is from Phoenix.[9] (DSMF ¶¶ 84–85; PSMF ¶¶ 30, 33.)

Plaintiff made multiple complaints in September 2013. One complaint was about the May 2013 incident with Mr. Buterbaugh and another was about the Chick-Fil-A gift card. (DSMF ¶¶ 84, 86.) He also complained that a Pilot Scheduling Supervisor discriminated against him based on his disability, national origin, race, sexual orientation and because he is from Phoenix, because of the manner in which the supervisor forwarded information Plaintiff provided about his in-laws' deaths. (*Id.* ¶ 87.) Mr. Buterbaugh agreed that the supervisor should have drafted his own email about the funeral arrangements, instead of merely forwarding Plaintiff's email. (Buterbaugh Dep., at 102:09–105:16.)

Plaintiff also complained to Mr. Holliday on various occasions that Mr. Buterbaugh was not treating him fairly. (PSMF ¶ 45.)

### b. *Complaints about Alleged Threats*

As outlined below, during his employment with American Airlines, Plaintiff twice complained that coworkers had threatened him. Neither complaint expressly charged that he felt he was being discriminated against on the basis of his disability or sex. And neither complaint was embodied in any of his EEOC charges.

In late 2009 or early 2010, Plaintiff complained to Mr. Holliday that Crew Coordinator Steve Weil told Plaintiff that he "better watch his back" when he walks outside of the building. (Krohmer Dep., at 82:15–83.) Mr. Holliday testified that he did not recall this complaint. (Holliday Dep., at 96:21–97:2.)

---

[9] Plaintiff also made a November 2012 complaint that a coworker taunted him for wearing the color of the Cleveland Browns on the day the Browns played the Pittsburgh Steelers. (DSMF ¶ 84.)

In December 2014, Crew Coordinator Kent Cardwell confronted Plaintiff over an issue related to pilot notifications. (PSMF ¶ 48.) Mr. Cardwell approached Plaintiff at his workstation, threw a document at him, pointed his finger at him, yelled that he doesn't have to take Plaintiff's "crap" anymore, and told Plaintiff that they can settle this "in a man's way." (*Id.*) When Plaintiff asked Mr. Cardwell to stop, Mr. Cardwell responded that he would raise his voice and point his finger at Plaintiff any time he wants. (*Id.*) Plaintiff complained to Mr. Holliday that Mr. Cardwell told him they could "take it outside"; HR Director Szumski was also informed. (*Id.* ¶ 49.) No further action was taken against Mr. Cardwell, and Plaintiff received no further follow-up from Mr. Holliday or HR. (*Id.*)

### c.   *Complaints about Alleged Improper Reduction of Plaintiff's Seniority*

The parties dispute the facts surrounding an issue involving Plaintiff's seniority date. Plaintiff initially began working at America West through a temporary agency in Phoenix. (*Id.* ¶ 50.) When the scheduling operation was transferred to Pittsburgh, Plaintiff was offered a job with US Airways. (*Id.*) It is undisputed that Plaintiff's start date for purposes of seniority was at some point recorded as the date he started at America West (January 2008) and not the date he started at US Airways (March 2008).[10] Plaintiff says that the January start date was correct. (*Id.* ¶ 51.) But Defendant says that the January date was recorded in error and that Plaintiff's proper start date was the date he started at US Airways (the March date). (*See* Defendant's Response to PSMF ¶¶ 51–54.) Mr. Buterbaugh testified that it was "Company policy" to use the date when the employee started with the Company (the March date). (Buterbaugh Dep., at 52:01–24.) And HR Manager

---

[10] Plaintiff states that these dates were January and March 2007, but the record shows that January and March 2008 are actually the relevant dates. (ECF No. 64-6, at 53–61.) The Court also notes that in his Charge of Discrimination filed with the EEOC on this matter, Plaintiff stated that his original date of hire should have been recorded as October 2007. (ECF No. 55-2, at 71.)

Sanders stated in an email at the time that using the earlier date (the January date) would be inconsistent with "Company practices." (ECF No. 64-6, at 57.)

Certain employees, including Mr. Holliday, complained that Plaintiff's seniority date was recorded incorrectly as the January date. (PSMF ¶ 52.) In October 2012, Mr. Holliday sent an email to HR Manager Sanders that he and the Pittsburgh OCC were "adamant" that Plaintiff's seniority date be moved from January to March. (*Id.* ¶ 53.) At some point in the end of 2012 or early 2013, Plaintiff's seniority was changed from a January start date to a March start date, which resulted in placing Plaintiff lower on the seniority list. (*Id.* ¶ 54.)

As referenced above, Plaintiff settled his first two EEOC charges in exchange for American Airlines's agreement to restore Plaintiff's seniority date to October 8, 2007. (*See id.* ¶ 40.)

### F.    Most Recent EEOC Charge

On May 16, 2016, Plaintiff filed a charge of discrimination with the EEOC challenging his termination. (DSMF ¶ 101.) On June 26, 2017, the EEOC dismissed Plaintiff's charge of discrimination with a "no cause" finding. (*Id.* ¶ 102.)

## II.    PROCEDURAL BACKGROUND

Plaintiff filed this lawsuit on September 22, 2017. (ECF No. 1.) In May 2019, Defendant filed a Motion for Summary Judgment on all claims. (ECF No. 52.) The Court reviewed the Motion for Summary Judgment (ECF No. 52), Plaintiff's Response in Opposition (ECF No. 65), Defendant's Reply (ECF No. 69), and all briefing and exhibits in support. The Court then held oral argument in this matter on October 29, 2019. (ECF No. 74.)

A few months later, the Court stayed the case pending the Supreme Court's disposition of the consolidated cases presenting the question of whether sexual orientation discrimination is an actionable claim under Title VII's bar on sex discrimination. (ECF No. 75.) In June 2020, in

*Bostock v. Clayton County.*, No. 17-1618, 2020 WL 3146686, 140 S. Ct. 1731 (Jun. 15, 2020), the

Supreme Court held that Title VII liability attaches to claims of discrimination on the basis of

sexual orientation. The parties then submitted supplemental briefing on *Bostock*'s impact, if any,

on this matter. (ECF Nos. 81, 84.) The matter is now ripe for the Court's disposition.

## III.    <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when "there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the moving party carries its burden under Rule

56, the non-movant must identify "specific facts which demonstrate that there exists a genuine

issue for trial." *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996) (citing

*Celotex*, 477 U.S. at 323). To meet its burden, the "opponent must do more than simply show that

there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the non-movant must respond by "pointing to

sufficient cognizable evidence to create material issues of fact concerning every element as to

which the nonmoving party will bear the burden of proof at trial." *Simpson v. Kay Jewelers, Div.*

*of Sterling, Inc.*, 142 F.3d 639, 643 n.3 (3d Cir. 1998). Moreover, labelling or characterizing a fact

as "disputed" does not make it so—the record evidence the opposing party points to must support

the dispute of fact, either through reasonable inference or otherwise. If the nonmoving party's

evidence is simply colorable or lacks sufficient probative force, summary judgment may be

granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).

In other words, summary judgment may be granted only if there exists no genuine issue of

material fact that would permit a reasonable jury to find for the nonmoving party. *See id.* at 250.

"Where the record taken as a whole could not lead a reasonable trier of fact to find for the

nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587; *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009).

In reviewing the record evidence, all reasonable inferences should be drawn in favor of the nonmoving party. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "The line between reasonable inferences and impermissible speculation is often 'thin,' *Fragale & Sons Beverage Co. v. Dill*, 760 F.2d 469, 474 (3d Cir. 1985), but nevertheless is critical because 'an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment.'" *Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014) (quoting *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990)). Any inference must follow directly from admissible evidence. *See Anderson*, 477 U.S. at 255.

And the Court may not weigh the evidence or make credibility determinations, but rather is limited to deciding whether there are any disputed issues that are both genuine and material. *Id*. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. "Where the defendant is the moving party, the initial burden is on the defendant to show that the plaintiff has failed to establish one or more essential elements to his case." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 589 (3d Cir. 2005) (citing *Celotex*, 477 U.S. at 322).

## IV.   DISCUSSION

Plaintiff asserts claims based on ADA Discrimination (Count I); ADA Retaliation (Count II); Title VII Sex Discrimination (Count III); Title VII Retaliation (Count IV); and Retaliation for Exercising FMLA Rights (Count V). Defendant seeks summary judgment on all claims. The Court will grant Defendant's Motion as to the discrimination claims and the FMLA retaliation claim (Counts I, III, and V) and will deny the Motion as to the ADA and Title VII retaliation claims

(Counts II and IV). The Court will address the discrimination claims first and then the retaliation claims.

### A. Discrimination Claims

Count I of Plaintiff's Complaint alleges disability-based discrimination in violation of the ADA, 42 U.S.C. § 12101, *et seq*. Count III alleges sex-based discrimination in violation of Title VII, 42 U.S.C. § 2000e–2(a)(1). Title VII makes it unlawful for an employer to discriminate against or discharge an employee "because of" the individual's "sex." In *Bostock*, the Supreme Court held that Title VII liability for discrimination "because of" an individual's sex encompasses discrimination because of an individual's sexual orientation, reasoning that "it is impossible to discriminate against a person for being [gay] without discriminating against that individual based on sex." *Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1741 (2020). In reaching this conclusion, the Court summarized the rule on sex discrimination emerging from Title VII: "An employer violates Title VII when it intentionally fires an individual employee based in part on sex. It doesn't matter if other factors besides the plaintiff's sex contributed to the decision." *Id.*

Discrimination claims under the ADA and Title VII are governed by the *McDonnell Douglas* burden-shifting test. *See Parker v. Verizon Pennsylvania, Inc.*, 309 F. App'x 551, 555 (3d Cir. 2009) (ADA discrimination claims); *Burton v. Teleflex, Inc.*, 707 F.3d 417, 425–26 (3d Cir. 2013) (Title VII discrimination claims). Under this framework, the plaintiff bears the initial burden of proving by a preponderance of the evidence a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the plaintiff succeeds, then the burden shifts to the defendant employer to articulate a legitimate, nondiscriminatory reason for the action. *Id.* If the defendant articulates such a reason, then the plaintiff has the opportunity to prove by a preponderance of the evidence that the reasons offered by the defendant were a pretext for

discrimination. *Id.* at 804.

### 1.   Prima Facie Case

A plaintiff's burden to establish a *prima facie* case of discrimination is similar for ADA claims and for Title VII claims. In order to establish a *prima facie* case of disability discrimination, Plaintiff must demonstrate that: (1) he is a disabled person within the meaning of the ADA; (2) he is qualified to perform the essential functions of the job, with or without reasonable accommodations; and (3) he suffered an adverse employment decision as a result of discrimination. *See McNelis v. Pa. Power & Light Co.*, 867 F.3d 411, 414–15 (3d Cir. 2017)[11]; *see also* 42 U.S.C. § 12111(8) (defining "qualified individual"). To establish a *prima facie* case of sex discrimination, the plaintiff must show: (1) they belong to a protected class; (2) they were qualified for the position at issue; and (3) they were subject to an adverse employment action as a result of their sex. *See Burton*, 707 F.3d at 426.

A plaintiff may establish the last element by showing either that non-protected individuals were treated more favorably, or by pointing to facts otherwise tending to establish that he suffered an adverse employment action under circumstances giving rise to an inference of discrimination. *See id.* "The central focus of the *prima facie* case is always whether the employer is treating some people less favorably than others because of their [protected identity]." *Mazur v. Sw. Veterans Ctr.*, 803 F. App'x 657, 661 (3d Cir. 2020) (citing *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003) (*per curiam*)). A plaintiff "must establish some causal nexus between his membership in a protected class and the [adverse employment decision]." *Sarullo*, 352 F.3d at 798. The *prima facie* inquiry is "flexible and must be tailored to fit the specific context in which

---

[11] Courts sometimes use a four-part test, separating the third element into two. *See, e.g.*, *Mazur v. Sw. Veterans Ctr.*, 803 F. App'x 657, 661 (3d Cir. 2020).

it is applied." *Id.* at 797–98.

For the reasons set forth below, the Court concludes that Plaintiff fails to make out a *prima facie* case for either discrimination claim.

### a.  Count I: Disability Discrimination

Defendant does not dispute that Plaintiff satisfies the first two elements of his *prima facie* case for his ADA discrimination claim: that Plaintiff's AIDS qualifies as a disability under the ADA and that Plaintiff was qualified for the crew scheduler position. It is also undisputed that his employment termination constitutes an adverse action.[12]

Plaintiff's ADA *prima facie* case thus hinges on whether Plaintiff has shown that a jury could rationally conclude that he was terminated from employment because of discrimination on the basis of his having AIDS. Plaintiff argues that the record shows his termination occurred under circumstances that raise an inference of disability discrimination.[13] Defendant contends that there is no evidence that Mr. Holliday, the undisputed sole decisionmaker, harbored or applied discriminatory animus toward Plaintiff or disabled employees generally.

The Court concludes that Plaintiff fails to present sufficient evidence from which a rational factfinder could reasonably conclude that Plaintiff's termination was a result of discrimination on the basis of Plaintiff's disability. The record indicates that Mr. Holliday was aware of Plaintiff's AIDS status. But the record does not support Plaintiff's contention that this knowledge (or any animus stemming from that knowledge) factored into Mr. Holliday's decision to terminate

---

[12] Plaintiff was suspended on June 18, 2015 and put on administrative leave with pay. (Krohmer Dep., at 193:6–9.) A suspension with pay does not typically constitute an adverse employment action. *See Jones v. SEPTA*, 796 F.3d 323, 324 (3d Cir. 2015). And it appears undisputed by the parties that the adverse employment action at issue in this case is the termination of Plaintiff's employment.

[13] Plaintiff also argues that Ms. Gibbs treated him differently than she treated Ms. Corrica during Ms. Gibbs's investigation. (ECF No. 65, at 10.) Regardless of the validity of such an argument, it is undisputed that Ms. Gibbs did not know Plaintiff has AIDS until after her investigation was complete. (DSMF ¶ 26; Plaintiff's Response to DSMF ¶ 26.)

Plaintiff's employment.

Plaintiff's primary argument on this issue conflates his Title VII claim with his ADA claim. Plaintiff emphasizes that Mr. Holliday revealed in a deposition that one of the reasons Mr. Holliday credited Ms. Corrica's allegations against Plaintiff was that Mr. Holliday heard from someone soon after Plaintiff was hired that Plaintiff had been arrested for giving oral sex to a man in the backseat of a car. (*See* ECF No. 65, at 6–7.) The rumor did not refer to AIDS in any way. But Plaintiff argues that Mr. Holliday's consideration of this rumor supports an inference of unlawful discrimination with regards to his ADA claim. He contends that "Holliday's alleged concern about [Plaintiff] allegedly performing a sex act on another man" is linked to "a well-known and obvious connection between gay men and the HIV virus and AIDS. Thus, a reasonable jury could conclude that Holliday harbored discriminatory animus against [Plaintiff] because he . . . had been diagnosed with [] AIDS." (ECF No. 65, at 7–8.) However, even if the rumor were to establish an inference of discrimination to support Plaintiff's Title VII claim, such evidence, on its own, would not automatically translate to evidence supporting his ADA claim.[14] Plaintiff cites to no cases that would support such a leap of inferences, and the Court knows of none. The Court does not dispute Plaintiff's assertion that individuals may hold an odious perception linking gay men to HIV/AIDS. But there is nothing in the record upon which a reasonable juror could infer that Mr. Holliday held such a view simply because he had heard from another employee that Plaintiff had discussed in the workplace his own alleged sexual activity with another man.

Plaintiff's argument instead appears to be premised upon "his own feeling that [Mr. Holliday] behaved in a discriminatory manner" based on Plaintiff's unsupported speculation that Mr. Holliday held animus against Plaintiff because Plaintiff is gay and was later diagnosed with

---

[14] Regardless, the rumor itself does not support Plaintiff's Title VII claim either. Such is discussed below.

AIDS. *See Oguejiofo v. Bank of Tokyo Mitsubishi UFJ Ltd*, 704 F. App'x 164, 169 (3d Cir. 2017).

Plaintiff contends that a reasonable jury could conclude that Mr. Holliday harbored discriminatory

animus toward Plaintiff because of the mere facts that Plaintiff "was involved in an intimate

relationship with another man and [Mr.] Holliday knew that [Plaintiff] had been diagnosed with

AIDS." (ECF No. 65, at 7.) In that sense, the most Plaintiff can assert about his disability in

particular is that Mr. Holliday's awareness of Plaintiff's AIDS diagnosis amounts to animus. But

this argument is too conclusory to satisfy the third prong. *See Taylor v. Cherry Hill Bd. of Educ.*,

85 F. App'x 836, 839 (3d Cir. 2004) ("conclusory allegations of discrimination, in the absence of

particulars, are insufficient to defeat summary judgment" (citing *Jalil v. Avdel Corp.*, 873 F.2d

701, 708 (3d Cir. 1989)); *see also Tucker v. Thomas Jefferson Univ.*, 484 F. App'x 710, 712 (3d

Cir. 2012). The Court also notes that Mr. Holliday testified that he was told of Plaintiff's workplace

statement about his own sexual conduct in around 2008, but Plaintiff was not diagnosed with AIDS

until five years later in 2013. (Krohmer Dep., at 39:18–40:7; Holliday Dep., at 122:11–124:11.)

Beyond this argument, Plaintiff points to various complaints that he made throughout his

time at the Company in which he alleged that other employees held discriminatory animus toward

him. Particularly relevant to Plaintiff's ADA claim is Mr. Buterbaugh's "interrogation" of Plaintiff

about his AIDS diagnosis, after which Mr. Buterbaugh allegedly stopped talking to Plaintiff except

to discipline him. Defendant argues that the Court should disregard this incident—even assuming

it does suggest animus on behalf of Mr. Buterbaugh—because the undisputed evidence shows that

Mr. Holliday alone made the final decision to terminate Plaintiff's employment.

As Defendant recognizes, the evidence of prejudicial views of a non-decisionmaker does

not defeat summary judgment on its own.[15] *See, e.g.*, *Burrows v. Twp. of Logan*, 415 F. App'x 379,

---

[15] It also true that an employer may be liable for discrimination when a nonbiased decisionmaker is influenced by a
biased managerial employee. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 421–22 (2011). This is called the "cat's paw"

384 (3d Cir. 2011); *Parish v. UPMC Univ. Health Ctr. of Pittsburgh*, 373 F. Supp. 3d 608, 630–

632 (W.D. Pa. 2019); *Drwal v. Borough of W. View, Pa.*, 617 F. Supp. 2d 397, 417 (W.D. Pa.

2009). Here, it is undisputed that Mr. Holliday was the sole decisionmaker and did not consult

anyone else when deciding to fire Plaintiff. Plaintiff does not argue that there is a basis for

attributing any bias of Mr. Buterbaugh to Mr. Holliday. Mr. Buterbaugh's behavior thus does not

raise an inference of discrimination that would support Plaintiff's *prima facie* case of disability

discrimination. The Court further notes that, other than the incident with Mr. Buterbaugh, no one

affiliated with American Airlines made any comment that Plaintiff found offensive about the fact

that Plaintiff has AIDS. (DSMF ¶ 66; Plaintiff's Response to DSMF ¶ 66; Krohmer Dep., at 55:25–

56:3.) Likewise, Mr. Holliday also testified that he never heard any employee, including Mr.

Buterbaugh, express to him any sort of concern about Plaintiff's AIDS diagnosis. (Holliday Dep.,

at 45:21–46: 11.)

Additionally, Plaintiff asserts that Ms. Gibbs treated him differently than Ms. Corrica

during Ms. Gibbs's investigation. This argument fails to support Plaintiff's ADA claim because it

is undisputed that Ms. Gibbs did not know Plaintiff had AIDS until she was deposed for this case,

---

or "subordinate bias" theory of liability. But Plaintiff does not argue that this form of liability applies here. Notably, Mr. Buterbaugh did not lead the investigation or author or issue the report about the investigation; Ms. Gibbs did. (*See* Gibbs Dep., at 142:17–20; Buterbaugh Dep., at 138:5–7; *see also* DSMF ¶ 29; Buterbaugh Dep., at 138:4–141:9 (noting that Ms. Gibbs interviewed Mr. Buterbaugh, along with 18 other Crew Scheduling employees, during her investigation).) Nor did Mr. Buterbaugh consider or address the results of Ms. Gibbs's investigation; only Mr. Holliday did. (Holliday Dep., at 144:3–20; 147:17–22; 152:14–16; Buterbaugh Dep., at 131:12–132:8.) The facts in this case do not track the traditional circumstances where cat's paw liability may apply. Here, Plaintiff previously filed an EEOC charge related to Mr. Buterbaugh's interrogation of him; that charge was withdrawn as part of a settlement agreement. (*See* Krohmer Dep., at 88:3–90:11.) It was not pursued by Plaintiff, nor does the record reflect that any part of the settlement was the withdrawal or mitigation of any of Plaintiff's prior disciplinary sanctions. In other words, Plaintiff had the opportunity to litigate that charge, and it was resolved. On this record, the fact that Mr. Holliday relied on Plaintiff's disciplinary history, which included disciplinary action from Mr. Buterbaugh, in his decision to fire Plaintiff is not evidence of discrimination.

Plaintiff does argue that the conduct of non-decisionmakers, like Mr. Buterbaugh, shows a culture of discrimination at the Company and is therefore circumstantial evidence showing that Defendant's reasons for Plaintiff's termination were pretextual. The Court addresses this argument in more detail below when discussing pretext.

which occurred years after her investigation was complete. So, there is no record evidence to support an assertion that even if Ms. Gibbs had acted in a differential fashion that it had anything to do with Plaintiff's AIDS diagnosis.

Plaintiff makes other arguments, including that Mr. Holliday targeted Plaintiff's seniority date and that the Company didn't respond to Plaintiff's internal complaints. But those incidents do not suggest discrimination based on his disability. Plaintiff does not know which, if any, of his coworkers had a disability, and he makes no argument that similarly situated individuals without disabilities were treated differently. While Plaintiff is not required to satisfy the third element by showing more favorable treatment of similarly situated individuals outside the protected class, Plaintiff here has also failed to present other facts sufficient to show that he was terminated under circumstances giving rise to an inference of unlawful disability discrimination.

In sum, Plaintiff fails to demonstrate that his termination bore any relationship to his disability. The Court therefore concludes that Plaintiff does not establish a *prima facie* case of discrimination under the ADA.

### b.  *Count III: Title VII Discrimination*

Turning to Plaintiff's Title VII discrimination claim, Plaintiff meets the first two elements of a *prima facie* case: he is a gay male, *see Bostock*, 140 S. Ct. at 1741, and he was qualified for the crew scheduler position. And it is again undisputed that his termination constitutes an adverse action. The question here is thus whether Plaintiff has met the last element by presenting evidence to show that his employment was terminated because of his sex. Plaintiff contends that the record supports the conclusion that he was terminated under circumstances that raise an inference of discrimination based on his sexual orientation. The Court disagrees.

Upon learning of Ms. Corrica's allegations against Plaintiff, Mr. Holliday requested that HR investigate Ms. Corrica's complaints, and Mr. Holliday was then the sole decisionmaker who decided to terminate Plaintiff's employment based on those complaints. As referenced above, Mr. Holliday testified in his deposition that one of the reasons he credited Ms. Corrica's allegations was because he was aware of other workplace comments that Plaintiff had made that Mr. Holliday considered to be sexually inappropriate. Among other things, Mr. Holliday testified that in 2008 he heard that Plaintiff had told coworkers that he, Plaintiff, had been arrested for engaging in oral sex in a car with another man. Mr. Holliday did not recall who told him about this alleged comment or the context in which he heard it. (Holliday Dep., at 123:33–125:18.) Mr. Holliday did not follow up on the comment at the time or talk to anybody about it, and he never asked Plaintiff about it. (*Id.* at 124:12–125:18.)

Plaintiff argues that Mr. Holliday's consideration of the rumor raises an inference of discrimination against Plaintiff on the basis that Plaintiff is gay. Defendant argues that Mr. Holliday's reliance on this rumor does not suggest discriminatory animus because Plaintiff points to no evidence that Mr. Holliday considers the workplace description of sexual encounters of a gay employee any more or less appropriate than that of a non-gay employee. Defendant labels Plaintiff's argument on this point "baseless speculation" that does not defeat summary judgment. (ECF No. 69, at 7.)

Even viewed in the light most favorable to Plaintiff, Mr. Holliday's consideration of this alleged rumor in deciding to credit Ms. Corrica's allegations could not support a reasonable jury's conclusion that Mr. Holliday's firing of Plaintiff was based on discriminatory animus toward Plaintiff because he is gay and engaged in sexual relations with another man. As Plaintiff admitted in his deposition, Mr. Holliday was faced with a "he said/she said" situation; Ms. Corrica made

allegations against Plaintiff, and Plaintiff denied these allegations. Mr. Holliday was thus in a position where he had to decide who to believe. He testified that one of the reasons he credited Ms. Corrica's allegations is because he was aware of other instances in which Plaintiff made comments of a sexual nature, including but not limited to Plaintiff's alleged comment in 2008. Importantly, Mr. Holliday also pointed to the statement of another employee, Ms. McConnell, who reported to Ms. Gibbs that she knew Plaintiff to make sexual comments, including a comment about "Naked Mondays." Mr. Holliday testified that he considered Ms. McConnell to be "very credible" and that he believed Ms. Corrica's allegations in part because of Ms. McConnell's statement about her interactions with Plaintiff. (Holliday Dep., at 149:12–17; 194:25–195:6.)

That Mr. Holliday considered everything he knew about Plaintiff—including workplace comments he believed that Plaintiff had made—to determine whether or not to credit Ms. Corrica's allegations does not indicate that Mr. Holliday discriminated against Plaintiff. Mr. Holliday's testimony about the 2008 alleged statement shows only that he considered it for the purpose of evaluating the credibility of Ms. Corrica's allegations. Mr. Holliday did not testify that he considered the rumor substantially inappropriate because it involved sex between two men. Nor is there anything in the record that would rationally support that conclusion. Ms. Corrica's alleged comments about her being attracted to Aryan men and her showing a photograph of herself with a celebrity are not examples of equivalent conduct in terms of Mr. Holliday making a credibility assessment. It is undisputed that Plaintiff could not identify any offensive comment made by Mr. Holliday or any other Company employee about the fact that Plaintiff is gay. (DSMF ¶¶ 65–66; Plaintiff's Response to DSMF ¶¶ 65–66 (citing only to Mr. Buterbaugh's "interrogation" of

Plaintiff about his AIDS diagnosis).)[16] The record does not support Plaintiff's theory of discrimination.

Plaintiff also argues that Mr. Holliday showed discriminatory animus by not responding to Plaintiff's complaints and by working to reduce Plaintiff's seniority date. Plaintiff complained multiple times about Mr. Buterbaugh's conduct toward him, including what Plaintiff perceived as Mr. Buterbaugh's interrogation of him about his AIDS status. Plaintiff twice complained to Mr. Holliday about coworker threats of violence, and Mr. Holliday allegedly didn't follow up on these complaints. Additionally, before Mr. Holliday started supervising Plaintiff, Mr. Holliday complained to HR that he was "adamant" that Plaintiff's seniority date be reduced. The parties dispute Mr. Holliday's motivation on this issue. Plaintiff maintains without any evidentiary support that Mr. Holliday took efforts to reduce Plaintiff's seniority out of discriminatory animus, but Defendant argues the change was justified by Company policy.[17]

These circumstances do not raise inferences of discrimination on Mr. Holliday's part. And Plaintiff does not point to any non-gay similarly situated individuals who were treated any

---

[16] The Court notes that Plaintiff testified that back in 2008 he told Mr. Holliday and Mr. Buterbaugh that he was being singled out because of his sexuality and Mr. Holliday responded by telling him that there are lots of "those types" at the Company. (Krohmer Dep., at 128:1–12.) Neither party discusses this testimony in their facts or their briefing. One of Defendant's undisputed facts is that "[Plaintiff] could not identify any offensive comment made by anyone affiliated with American Airlines about the fact that [Plaintiff] is gay." (DSMF ¶ 65.) In response, Plaintiff stated, "Undisputed but incomplete for the reasons outlined in Paragraphs 17 through 28 of Plaintiff's Concise Statement of Material Facts Precluding Summary Judgment detailing [Mr.] Buterbaugh's improper questioning of [Plaintiff] concerning his AIDS diagnosis." (Plaintiff's Response to DSMF ¶ 65.) As Plaintiff says, Paragraphs 17 through 28 in his statement of undisputed and material facts discusses only Mr. Buterbaugh's alleged interrogation of Plaintiff about his AIDS diagnosis and nothing else. The Local Rules of the Western District of Pennsylvania explain that alleged material facts "will for the purpose of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party." W.D. Pa. LCvR 56(E); *see also Hill v. Barnacle*, 509 F. Supp. 3d 380, 386 (W.D. Pa. 2020) (explaining that the Court "strictly applie[s]" Local Rule 56(E)). For purposes of deciding Defendant's Motion for Summary Judgment, it is therefore undisputed that, other than the Mr. Buterbaugh incident, Plaintiff could not identify what he considered to be an offensive comment from any Company employee (which would include Mr. Holliday) about the fact that Plaintiff is gay.

[17] An email from an otherwise non-involved HR manager at the time stated that Company practices supported the reduction. (ECF No. 64-6, at 57.) Moreover, this issue was resolved pursuant to a settlement agreement after Plaintiff filed an EEOC charge about the issue in 2013.

differently. For example, though Plaintiff argues that there was a zero-tolerance policy for violence at work, he does not identify any instances when Mr. Holliday applied such policy in a differential manner as to other individuals. And though he took issue with Mr. Holliday's efforts to reduce his seniority date, Plaintiff does not identify anyone who had a differently calculated date (or any other evidence supporting his theory).

Plaintiff fails to raise an inference of discrimination that his employment was terminated because of his sex. The Court thus concludes that Plaintiff does not establish a *prima facie* case of discrimination under Title VII.

### 2.   Articulated Reason for Termination

If Plaintiff were to make out a *prima facie* claim of ADA or Title VII discrimination, the burden would shift to Defendant to provide a legitimate, nondiscriminatory explanation for Plaintiff's termination. The burden at this step is "relatively light and is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Burton*, 707 F.3d at 426.

Defendant has met its burden: Plaintiff allegedly engaged in unprofessional conduct towards a coworker and was terminated following an independent HR investigation into the complaints against Plaintiff. Plaintiff does not argue that Defendant has failed to articulate a nondiscriminatory rationale for the alleged discriminatory action.

### 3.   Pretext

Even if Plaintiff had made out a *prima facie* case of ADA or Title VII discrimination, Plaintiff's claims would nonetheless still fail because he fails to advance evidence sufficient to establish pretext. To demonstrate that the stated reasons for Plaintiff's termination could be found to be pretextual, Plaintiff must point to some evidence, direct or circumstantial, from which a

factfinder could reasonably either (i) disbelieve the proffered reasons, or (ii) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the adverse employment action. *See Burton*, 707 F.3d at 427 (quoting *Fuentes v. Perske*, 32 F.3d 759, 764 (3d Cir. 1994)); *see also Hatch v. Franklin County*, 755 F. App'x 194, 198 (3d Cir. 2018).

Under the first *Fuentes* prong, a "plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" *Burton*, 707 F.3d at 427 (quoting *Fuentes*, 32 F.3d at 765). To discredit the proffered reasons, a plaintiff "cannot simply show that the employer's decision was wrong or mistaken." *Fuentes*, 32 F.3d at 765. Under the second *Fuentes* prong, pretext can be shown "by producing evidence that: (1) the employer previously has discriminated against the plaintiff; (2) the employer has discriminated against other persons; or (3) the employer has treated more favorably similarly situated employees outside of the plaintiff's protected class." *Parish*, 373 F. Supp. 3d at 633.

Plaintiff argues that he establishes pretext for both his ADA and Title VII claims under both *Fuentes* prongs. (ECF No. 65, at 12.) Plaintiff offers the same evidence of pretext for both his ADA and Title VII discrimination claims, so the Court will evaluate them together. Plaintiff relies on much of the same evidence that he cited to make out a *prima facie* case, an approach that the Third Circuit deems appropriate. "Evidence used to establish a *prima facie* case of discrimination may also be relied upon to demonstrate pretext, since nothing about the *McDonnell Douglas* framework requires a court to ration the evidence presented in a particular case among the *prima facie* and pretext stages of the plaintiff's case." *Hubbell v. World Kitchen, LLC*, 688 F.

Supp. 2d 401, 415 (W.D. Pa. 2010), *on reconsideration*, No. 06-1686, 2010 WL 5092255 (W.D.

Pa. Dec. 8, 2010) (citing *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 370 (3d Cir. 2008)).

"[A] plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's

asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully

discriminated." *Reeves*, 530 U.S. at 148.

Defendant's proffered rationale for Plaintiff's termination is Plaintiff's alleged "grossly

inappropriate workplace behavior," as complained of by Ms. Corrica and investigated by Ms.

Gibbs. (*See* ECF No. 53, at 5.) Ms. Corrica's complaints included allegations that Plaintiff made

sexually inappropriate comments to her. Mr. Holliday terminated Plaintiff's employment after Mr.

Holliday decided to credit Ms. Corrica's allegations upon his consideration of multiple factors,

including Ms. Gibbs's investigative report, Plaintiff's disciplinary history, and Mr. Holliday's

belief that Plaintiff had previously made sexually inappropriate comments at work.

Plaintiff tosses out a lot of pretext arguments, none of which carry the day with regards to

his discrimination claims. The Court will address each argument in turn.

First, Plaintiff generally challenges Mr. Holliday's decision to credit Ms. Corrica's

allegations. Plaintiff points to findings in Ms. Gibbs's investigative report that other employees

called Ms. Corrica "paranoid," "crazy," and "scary crazy," and that some employees said they felt

uncomfortable working with Ms. Corrica. Given these reports, Plaintiff argues that Mr. Holliday's

reliance on Ms. Corrica's allegations is itself evidence of pretext. But if that were the case, any

plaintiff could establish pretext merely by objecting to an employer's decision or investigation.

The question is not whether Mr. Holliday's decision was wrong or mistaken in crediting the

allegations against Plaintiff, but rather whether a jury could reasonably conclude that Mr. Holliday

was actually acting with discriminatory animus when he did so. *See Parker*, 309 F. App'x at 557

(citing *Geddis v. Univ. of Del.,* 40 Fed. App'x 650, 652 (3d Cir. 2002)). "If an employer relies on statements and complaints by coworkers when making a decision to terminate an employee, the employee cannot later establish pretext by simply challenging the veracity of such statements." *McCormick v. Allegheny Valley Sch.*, No. 06-3332, 2008 WL 355617, at *16 (E.D. Pa. Feb. 6, 2008); *see also McNeil v. Greyhound Lines, Inc.*, 69 F. Supp. 3d 513, 524 (E.D. Pa. 2014), *aff'd sub nom. McNeill v. Greyhound Lines, Inc.*, 628 F. App'x 101 (3d Cir. 2015); *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 468 (3d Cir. 2005) (stating that courts generally "do not second guess the method an employer uses to evaluate its employees"). For further support, Plaintiff cites to an email that Mr. Holliday sent to HR soon after he learned of Ms. Corrica's allegations in which he stated he was not "prejudging" the investigation, but that Plaintiff's comments were very offensive. This email does not support Plaintiff's argument that Mr. Holliday's reasons were pretextual. It merely shows that Mr. Holliday was concerned enough about the allegations from the outset to trigger an investigation but did not want to judge the actuality of the allegations prematurely. His characterizing them as "offensive" is simply a description of them as they were reported, and not a determination as their accuracy. After all, that is why the Ms. Gibbs investigation was convened. Consequently, Plaintiff's contention on this point is unavailing.[18]

Second, Plaintiff highlights record evidence that Ms. Corrica's alleged inappropriate behavior continued after Plaintiff's termination. Despite Plaintiff's urging that the Court consider this conduct, the Court finds this evidence irrelevant to the question of pretext because Mr. Holliday did not know it when he decided to credit Ms. Corrica's allegations and then to terminate Plaintiff's employment. He did not know of this evidence because it had not yet occurred. "The

---

[18] And, as a logical matter, even an employee with the characteristics attributed to Ms. Corrica can still be accurate and correct in her accounts of coworker conduct. Plaintiff advances no record basis to conclude that Ms. Gibbs's reporting of Ms. Corrica's allegations or Mr. Holliday's crediting of them was in itself irrational or discriminatory.

question in assessing [Mr. Holliday's] proffered legitimate reason for terminating [Plaintiff] is whether a reasonable jury could believe that the reason was pretextual at the time it was made." *See Rodriguez v. Forthright*, 665 F. App'x 204, 207 (3d Cir. 2016). At the time Mr. Holliday terminated Plaintiff's employment, there was no way for Mr. Holliday to know about what Ms. Corrica might end up doing sometime in the future.

Third, Plaintiff contends that in the normal course of business, Mr. Holliday is not the sole decisionmaker on termination matters and that others are usually involved in the decision-making process. Such inconsistency—if it were supported by the record—could in theory support a reasonable factfinder's conclusion that Mr. Holliday's decision was pretextual. But the record does not support Plaintiff's assertion. It is undisputed that Ms. Gibbs submitted a report to Mr. Holliday and that Mr. Holliday was the sole decisionmaker who decided to fire Plaintiff. Plaintiff cites deposition testimony from an HR manager (not Ms. Gibbs) to support his argument that investigators "normally make a recommendation to the manager" and that "others are involved in the decisionmaking process." (ECF No. 65, at 18 (citing Julie Szumski Deposition, "Szumski Dep.," ECF No. 64-9, at 90:17–91:09; 138:23–139:17).) But the cited-HR Manager said that she does not always make a recommendation, and she elaborated that there is ultimately "a final, single decisionmaker." (Szumski Dep., at 139:7–141:6.) Moreover, she testified that she didn't know the protocol of the investigator in Plaintiff's case. (*Id.*) And Ms. Gibbs—the actual investigator assigned to investigate Ms. Corrica's allegations—testified that she does not usually make a recommendation when it comes to discipline. (Gibbs Dep., at 118:4–16.) There is therefore nothing inconsistent or unusual about the process employed by Defendant in this case.

Fourth, turning to the second *Fuentes* prong, Plaintiff argues that he was subjected to a double standard by Ms. Gibbs. (ECF No. 65, at 18.) He says that Ms. Gibbs ignored Ms. Corrica's

breach of confidentiality but investigated Plaintiff for breaching the same agreement. However, Plaintiff admits that the relevant conduct of Plaintiff and Ms. Corrica were not the same; Plaintiff was accused of distributing a mugshot of Ms. Corrica around the workplace and Ms. Corrica was accused of asking a coworker if she had been contacted in connection with the investigation. Plaintiff also makes much of the fact that Ms. Gibbs did not force Ms. Corrica to produce her diary, which included information relevant to Ms. Corrica's complaints against Plaintiff. Putting aside that Ms. Corrica actually produced copies of pages of her diary to Ms. Gibbs, Plaintiff's critique of Ms. Gibbs's investigation cannot establish pretext without evidence that the investigation was "utterly foolish, biased, or unsubstantiated." *Caplan v. L Brands/Victoria's Secret Stores, LLC*, 210 F. Supp. 3d 744, 768 (W.D. Pa. 2016), *aff'd sub nom. Caplan v. L Brands/Victoria's Secret Stores*, 704 F. App'x 152 (3d Cir. 2017). While Plaintiff says that Ms. Gibbs's investigation was biased, Plaintiff's complaints really just go to the adequacy of the investigation. Plaintiff's position is a bit circular; he says the investigation was biased because he disagrees with Ms. Gibbs's investigatory choices, and he disagrees with those choices because he says they're biased. Plaintiff does not present any other evidence to show that Ms. Gibbs was biased against Plaintiff. Because evidence that an investigation was "imperfect, unwise, or inaccurate" is insufficient to establish pretext, Plaintiff's disagreements with Ms. Corrica's investigation do not support Plaintiff's position. *See id.*

Fifth, Plaintiff argues that the Company tolerated a culture of discrimination at the Pittsburgh OCC, which Plaintiff says helps establish pretext when coupled with other evidence. Plaintiff believes there was a discriminatory atmosphere at the Pittsburgh OCC based on the following evidence: Mr. Buterbaugh's "interrogation" of Plaintiff about his AIDS diagnosis, Mr. Buterbaugh's alleged subsequent shunning and discipline of Plaintiff, and the Company's alleged

failure to respond to Plaintiff's complaints of discrimination (notwithstanding that it ultimately settled a charge on terms favorable to Plaintiff by adjusting/confirming his seniority date). The Third Circuit has recognized that proof of a discriminatory atmosphere may be relevant in showing pretext because such evidence "tend[s] to add color to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff." *Ezold v. Wolf*, 983 F.2d 509, 546 (3d Cir. 1992) (citation omitted). But there is no evidence that a discriminatory atmosphere existed pertaining to Plaintiff's sexual orientation or disability. In *Ezold*, the plaintiff presented six sexist comments made by a non-decisionmaker male partner at their law firm over a period of five years to show that her denial of a promotion was likely the result of discriminatory bias. *Id.* at 547. The court held that the stray remarks were insufficient to show that a discriminatory bias more likely motivated the Defendant's promotion decision than its articulated reason. *Id.* The court stated that to hold otherwise "would spill across the limits of Title VII." *Id.*

Here, the only evidence of a discriminatory atmosphere that Plaintiff points to that could presumably be about one of his protected statuses is Mr. Buterbaugh's interrogation of him about his AIDS status in 2013. That interrogation occurred almost two-and-a-half years before Plaintiff's termination. *See Fuentes*, 32 F.3d at 767 ("Stray remarks by non-decisionmakers . . . are rarely given great weight, particularly if they were made temporally remote from the date of decision." (quoting *Ezold*, 983 F.2d at 545)). Though Plaintiff contends that subsequent discriminatory treatment followed that incident, he does not offer any evidence that such was due to his disability or to his sexual orientation,[19] or that it was pervasive to the extent that it showed that Mr. Holliday's termination decision was more likely the result of an atmosphere of discriminatory bias than

---

[19] Plaintiff's complaints that he was mistreated because he was from Phoenix or wore Cleveland Browns colors do not implicate any statutorily protected statuses.

Plaintiff's alleged inappropriate behavior.

Sixth, Plaintiff contends that Mr. Holliday previously discriminated against Plaintiff and that Mr. Holliday gave similarly situated individuals more favorable treatment. Notably, at the pretext stage, "the factual inquiry into the alleged discriminatory motives of the employer [rises] to a new level of specificity." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 646 (3d Cir. 1998). Plaintiff's proffered evidence does not cut it. On the first point, Plaintiff says that Mr. Holliday discriminated against him by working to reduce his seniority date. However, there is no evidence in the record suggesting that Mr. Holliday did so for unlawfully discriminatory reasons, other than Plaintiff's own speculation, and the record reflects that a number of others, including an HR manager involved in these matters, held the same assessment of the seniority question. On the second point, Plaintiff says that Mr. Holliday and the Company disciplined Plaintiff for all types of infractions but failed to investigate or act in response to Plaintiff's complaints. Plaintiff argues that this demonstrates that discrimination was more likely than not a motivating or determinative cause of his termination. But to be proper comparators, the other employees must have been "similarly[] situated in all respects." *In re Tribune Media Co.*, 902 F.3d 384, 403 (3d Cir. 2018). In other words, the comparator employees must have "dealt with the same supervisor, been subject to the same standards, and engaged in the same conduct." *Id.* (cleaned up). Plaintiff does not assert that he complained of conduct similar to Ms. Corrica's allegations, which included allegations of multiple inappropriate workplace comments over a short period of time. And he does not offer up the conduct of other comparators or Defendant's response to them.[20]

---

[20] Plaintiff argues that Mr. Buterbaugh cooperated with a coworker when she asked for information on the seniority bid roster, but Mr. Buterbaugh did not cooperate with Plaintiff when he asked for the same information. (*See, e.g.*, ECF No. 65, at 10, 21 (citing PSMF ¶ 57).) This argument fails to support his discrimination claims. Not only does it concern Mr. Buterbaugh only and the Plaintiff does not tie this assertion to the sole decisionmaker, Mr. Holliday, but the evidence that Plaintiff cites simply does not support Plaintiff's contention.

Seventh, for much of the same reasons explained above in the *prima facie* section, Mr. Holliday's consideration of the rumor that Plaintiff told someone at work in 2008 that he had been arrested for engaging in sexual conduct with a man in a car could not rationally establish pretext. Defendant's articulated reason for Plaintiff's termination is that Plaintiff engaged in the misconduct alleged by Ms. Corrica. That alleged misconduct included that Plaintiff made inappropriate sexual comments. As discussed, Mr. Holliday, the undisputed sole decisionmaker, said that he found credible Ms. Corrica's allegations about Plaintiff making inappropriate sexual comments in part because Mr. Holliday believed that Plaintiff had previously made sexually inappropriate comments in the workplace. Plaintiff does not dispute that Mr. Holliday actually heard that Plaintiff had made a sexual comment in the workplace or that Mr. Holliday honestly believed that Plaintiff had made such a comment.

Plaintiff does not establish why the proffered reason for termination could be rationally found to be unworthy of credence. He tries to do so by pointing to Mr. Holliday's testimony that Mr. Holliday "wasn't worried about" Ms. Corrica's alleged comments about being attracted to blonde-haired blue-eyed men and that people talk about who they're attracted to "all the time" in the workplace. (ECF No. 81, at 7 (citing Holliday Dep., at 151:10–24).) Plaintiff further highlights that Ms. Corrica showed coworkers a photograph of herself with a celebrity, in which Ms. Corrica was wearing a bathing suit. (ECF No. 81, at 7.) But Plaintiff's alleged workplace statement that explicitly referred to oral sex is simply not the "same conduct" as Ms. Corrica's Aryan/blonde-haired comment or her showing coworkers a celebrity photograph. *See In re Tribune Media Co.*, 902 F.3d at 403. Moreover, Plaintiff's arguments might have more legs had Mr. Holliday testified that he decided to discharge Plaintiff in part because Mr. Holliday heard that Plaintiff had made the 2008 workplace sexual comment. But Mr. Holliday said he looked to the comment from seven

years before not as to its substance, but only so far as doing so helped him assess the credibility of Ms. Corrica's allegations. *E.g.*, was it likely Plaintiff had indeed made the type of comments Ms. Corrica complained of? Mr. Holliday's consideration of the comment does not weaken or make inconsistent the proffered reason for termination (which was not the 2008 comment itself but rather Ms. Corrica's allegations against Plaintiff). In fact, Mr. Holliday's consideration of whether or not he knew Plaintiff to make sexual workplace comments in the past is fully in line with Mr. Holliday's reasons for termination, which was in part based on his previously held belief that Plaintiff made sexual comments at work.

In sum, the Court concludes that none of Plaintiff's arguments, either alone or in combination, provide sufficient evidence to support a reasonable jury finding that Defendant's legitimate, nondiscriminatory reason is unworthy of belief, or to permit an inference that the real reason Plaintiff was terminated from employment was because of his disability or sex.

\*\*\*

The "ultimate question" in every employment discrimination case involving a claim of disparate treatment is whether the employer intentionally discriminated against the plaintiff. *See Reeves*, 530 U.S. at 153. Neither ADA nor Title VII liability encompasses a plaintiff's general frustrations—untethered to his protected status—with his workplace. Plaintiff fails to establish that a reasonable jury could rationally conclude that his employment termination resulted from intentional discrimination based on his disability or sex.

Plaintiff's claim on Counts I and III therefore do not survive Defendant's Motion for Summary Judgment and will be dismissed.

## B.    **Retaliation Claims**

Discriminatory retaliation claims under the FMLA, the ADA, and Title VII are also

governed by the *McDonnell Douglas* burden-shifting framework. *Matos v. Merck & Co., Inc.*, 643 F. App'x 187, 190 (3d Cir. 2016) (ADA retaliation standard); *Moore v. City of Philadelphia*, 461 F.3d 331, 340–41 (3d Cir. 2006), *as amended* (Sept. 13, 2006) (Title VII retaliation standard); *Ross v. Gilhuly*, 755 F.3d 185, 193 (3d Cir. 2014) (FMLA retaliation standard).

As noted above, within this framework, the plaintiff bears the initial burden of proving by a preponderance of the evidence a *prima facie* case of retaliation. *See McDonnell Douglas Corp.*, 411 U.S. at 802. If the plaintiff succeeds, then the burden shifts to the defendant employer to articulate a legitimate, nondiscriminatory reason for the action. *Id.* If the defendant articulates such a reason, then the plaintiff has the opportunity to prove by a preponderance of the evidence that the reasons offered by the defendant were a pretext for retaliation. *Id.* at 804.

The Court will dismiss Plaintiff's FMLA retaliation claim only. Plaintiff's ADA and Title VII retaliation claims survive Defendant's Motion for Summary Judgment.

### 1.   Count V: FMLA Retaliation Claim

To state a *prima facie* case for retaliation under the FMLA (or the ADA or Title VII) a plaintiff must establish that (1) he engaged in protected activity; (2) the defendant took an adverse employment action against him; and (3) there is a causal link between the protected activity and the defendant's adverse action. *Kieffer v. CPR Restoration & Cleaning Services, LLC*, 733 F. App'x 632, 638 (3d Cir. 2018). In other words, "the plaintiff must produce evidence sufficient to raise the inference that [their] protected activity was the *likely reason* for the adverse employment action." *Carvalho-Grevious v. Delaware State University*, 851 F.3d 249, 259 (3d Cir. 2017).

Neither party contests that the first two prongs are met for any of the retaliation claims. The last FMLA leave Plaintiff took was in the spring of 2015. Plaintiff's employment termination constitutes an adverse employment action for all of his retaliation claims.

The Court then only needs to analyze the third prong. Under that prong, a plaintiff may rely on a "broad array of evidence" to demonstrate the causal link between the protected activity and the adverse employment action. *Id.* at 260. A plaintiff may establish causation by showing temporal proximity, a pattern of antagonism, inconsistent explanations for the adverse action, or other similar circumstantial evidence that could support an inference of a causal connection between the protected activity and the adverse employment action. *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997); *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280–81 (3d Cir. 2000). In assessing temporal proximity, a plaintiff generally must show either: (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action; or (2) a pattern of antagonism coupled with timing to establish a causal link. *Kieffer*, 733 F. App'x at 638 (citing *Budhun v. Reading Hosp. & Medical Center*, 765 F.3d 245, 258 (3d Cir. 2014)).

Plaintiff argues that his termination was causally related to his invocation of his right to FMLA-qualifying leave. But the record does not support this assertion because there is no evidence that supports an inference of retaliation for his taking FMLA leave.

Plaintiff's employment was terminated at least a couple of months after he last took FMLA leave. There is no precise date in the record, but Plaintiff testified that the last time he took FMLA leave was in the "spring of 2015." He was fired on July 22, 2015. Even assuming that his latest FMLA usage was in May 2015—just several months before his employment terminated—such temporal proximity is not enough on its own to establish causation. *See, e.g.*, *LeBoon v. Lancaster Jewish Comm. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) (three months is not unusually suggestive); *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004),

*superseded by statute on other grounds as stated in Robinson v. First State Cmty. Action Agency*,

920 F.3d 182, 187–89 & n.30 (3d Cir. 2019) (two months is not unusually suggestive).

To survive summary judgment, Plaintiff therefore needs to present more evidence to

establish causation, which he has not done. The following facts are undisputed: Plaintiff took

FMLA leave both before and after his AIDS diagnosis; Plaintiff submitted 15 or more applications

for FMLA leave during his employment, every one of which was granted (though he was once

accused of job abandonment by a supervisor not involved in these events and he was still approved

for that FMLA leave); no one in management or HR ever made a negative comment to Plaintiff

about his FMLA usage; and the last time Plaintiff took FMLA leave was in the spring of 2015.

And Plaintiff admits that there was never an occasion when Plaintiff was not allowed to take time

off for his FMLA-qualifying conditions. (*See* Plaintiff's Response to DSMF ¶¶ 72–76; Krohmer

Dep., at 64:16–68:2.)

Plaintiff makes much of an August 2013 incident when he was put on administrative leave

and investigated for job abandonment after he took FMLA leave and left work early. But he

testified that the result of that investigation was "unfounded" and that he was cleared of any

wrongdoing and not penalized in any way for taking the leave. (Krohmer Dep., at 65:4–68:2.) This

is the only specific instance about the Company's response to his taking FMLA leave that Plaintiff

points to in support of his FMLA retaliation claim.

The record thus does not show any pattern of antagonism toward Plaintiff pertaining to his

FMLA usage. To the contrary, the record shows that Defendant was supportive of Plaintiff's taking

such leave many times over a period of multiple years. Plaintiff admits that his applications for

FMLA leave (at least 15 of them) were always granted. (*See* Plaintiff's Response to DSMF ¶¶ 73–

75.) Plaintiff does not introduce any other pieces of evidence that would support an inference of a

causal connection between Plaintiff's termination and his FMLA usage. Nor does Plaintiff make any other decipherable arguments on this issue.

To be sure, employers "cannot use the taking of FMLA leave as a negative factor in employment actions." *Budhun*, 765 F.3d at 258 (citation omitted). But the record does not contain any evidence that could rationally persuade a reasonable factfinder that a causal link existed between Plaintiff's copious, approved FMLA usage and his termination. Plaintiff does not meet his burden to present a *prima facie* case of FMLA retaliation. For that reason, Plaintiff's FMLA retaliation claim fails and Defendant's Motion for Summary Judgment on the FMLA Retaliation Count will be granted.

### 2. Counts II and IV: ADA and Title VII Retaliation Claims

#### a. *Prima Facie Case*

The same legal standard to state a *prima facie* case applies to ADA and Title VII retaliation claims as to FMLA retaliation claims. Again, neither party contests that the first two prongs are met for the ADA and Title VII retaliation claims. Plaintiff engaged in multiple protected activities. The latest undisputed pre-termination protected activity under the ADA and Title VII was his filing of an EEOC charge on September 3, 2014. Plaintiff also engaged in protected activity when he filed two previous EEOC charges and internal complaints complaining about the type of conduct generally protected by the ADA or Title VII. *See Kengerski v. Harper*, No. 20-1307, --- F.4th ----, 2021 WL 3199225, at *4 (3d Cir. July 29, 2021); *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 195 (3d Cir. 2015).

As stated, the last undisputed ADA and Title VII-related protected activity in which Plaintiff engaged prior to his discharge was his September 3, 2014 charge of discrimination. This occurred ten months prior to his employment termination on July 22, 2015. This 10-month gap

between protected activity and discharge does not suffice, on its own, to create an inference of causal nexus based upon temporal proximity.

But Plaintiff argues that he establishes a *prima facie* case of retaliation because there is evidence of ongoing antagonism after the protected activity. (ECF No. 65, at 11.) "[A] plaintiff can establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period." *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920–21 (3d Cir. 1997). Ongoing antagonism may include evidence of unusually close supervision or aggressive discipline. *See, e.g., Robinson v. Se. Pa. Transp. Auth.*, 982 F.2d 892, 895 & n.2 (3d Cir. 1993). A pattern of antagonism, however, is more than a series of disciplinary actions; a plaintiff must "offer [a] basis for linking the disciplinary actions to [his protected activity]." *Barton v. MHM Correctional Servs.*, Inc., 454 F. App'x 74, 79 (3d Cir. 2011) (citing *Robinson*, 982 F.2d at 895).

There are three relevant pieces of evidence as to events between the last pre-termination EEOC charge and Plaintiff's employment termination. First, on September 10, 2014, exactly one week after Plaintiff filed his third EEOC charge, the Company issued a second "final" warning to Plaintiff based on Mr. Buterbaugh's conclusion that Plaintiff had acted unprofessionally toward a vendor hotel manager on August 1, 2014. According to the warning, Mr. Holliday and Mr. Buterbaugh had a meeting with Plaintiff about the August 1 incident at an unspecified date prior to the issuance of the final warning. Second, in December 2014, Plaintiff complained that a coworker had threatened him by suggesting they "take it outside" and settle their issues "in a man's way," but neither Mr. Holliday or HR responded or followed up on this complaint. Third, in March 2015, Mr. Holliday forwarded one of Plaintiff's Facebook posts to an HR Manager, commenting "you know the issues we have with [Plaintiff]."

Plaintiff argues that an alleged pattern of antagonism that followed his earlier protected activity also bears on whether he establishes a causal link. A quick recap of Plaintiff's history of complaints and discipline is therefore helpful. In 2009, the Company issued Plaintiff two different disciplinary warnings about his workplace behavior. In early 2012, Plaintiff was suspended for issues relating to his lack of professionalism. In March 2013, Mr. Buterbaugh "interrogated" Plaintiff about his AIDS diagnosis. A few days later, Plaintiff engaged in what appears to be his first protected activity when he filed an EEOC charge.[21] Between March and September 2013, Plaintiff filed multiple internal complaints that alleged discrimination based on his sexual orientation and disability. In early October 2013, the Company issued its first "final" warning to Plaintiff, warning him about his "unprofessional and uncooperative" behavior, though the warning did not identify any specific instances of misconduct. Plaintiff filed his second EEOC Charge in January 2014 and then his third EEOC charge in September 2014. Plaintiff was put on administrative leave with pay in June 2015 and fired in July 2015.

Plaintiff asserts that the Company's failure to investigate or act in response to his complaints, including about Mr. Buterbaugh's 2013 interrogation of him, is evidence of retaliatory animus. Defendant views Plaintiff's lengthy history of discipline and complaints differently, contending that the record shows that Mr. Holliday was "reluctant" to act against Plaintiff. (ECF No. 53, at 16.) Defendant also points to Plaintiff's "long history of being counseled for behavioral and professionalism problems without being terminated," including that Plaintiff received not one, but two "final" warnings before he was fired. (*Id.*)

It is certainly true that Plaintiff's history of discipline for unprofessional behavior, dating

---

[21] Prior to this EEOC Charge, Plaintiff had filed internal general complaints that did not implicate the ADA or Title VII. For example, Plaintiff complained in November 2012 that coworkers were watching sports too loudly in a common space and that a coworker made rude comments when Plaintiff inadvertently wore orange on a day when the black and yellow Pittsburgh Steelers were playing the orange and brown Cleveland Browns.

back to 2009 prior to any protected activity, makes it harder for him to establish a *prima facie* case of retaliation. "An employee cannot easily establish a causal connection between his protected activity and the alleged retaliation when he has received significant negative evaluations before engaging in the protected activity." *Ross*, 755 F.3d at 194. But such is not fatal to his retaliation claim. In determining whether causation can be gleaned from the record as a whole, there are "no limits" on what the Court can consider. *See Farrell*, 206 F.3d at 281.

The Court notes that even though there were ten months between the third EEOC Charge and Plaintiff's employment termination, in other instances there were just days between certain protected activity and other disciplinary warnings/action. For instance, exactly one week after Plaintiff filed his third EEOC charge in September 2014, Defendant issued its second final warning to him. The Court notes that this warning pertained to a disciplinary incident that preceded Plaintiff's EEOC charge by at least 33 days. And Defendant's first final warning in October 2013 came just three days after Plaintiff filed multiple internal complaints alleging disability and sexual-orientation discrimination, among other things.

It is also the case that Plaintiff had previously filed two EEOC charges and other internal statutorily protected complaints without receiving any follow-up disciplinary action. Certainly, a plaintiff cannot insulate himself from adverse action by repeatedly engaging in protected activity. *See Shaner v. Synthes*, 204 F.3d 494, 505 (3d Cir. 2000) ("[I]t is important that an employer not be dissuaded from making what he believes is an appropriate evaluation by a reason of a fear that the evaluated employee will charge that the evaluation was retaliatory.") But on the flip side, the fact that an employee has been regularly engaging in protected activity does not insulate the employer from retaliation charges. This is why "[w]hether a causal link exists 'must be considered with a careful eye to the specific facts and circumstances encountered.'" *See Budhun*, 765 F.3d at

258 (quoting *Farrell*, 206 F.3d at 279 n.5).

Viewing the facts in the light most favorable to Plaintiff, as the Court must, the record does not suggest a pattern of antagonism that by itself would provide the requisite inference of causation. In the ten months between the third EEOC charge and Plaintiff's termination, Plaintiff faced one final warning and that's it as to disciplinary action. Even if the Court considers Mr. Holliday's alleged failure to address Plaintiff's complaint in December 2014 to constitute antagonism against Plaintiff, that's not enough to establish a "pattern." And that Defendant elected to issue a second "final" warning in September 2014 in response to a documented incident of unprofessional behavior by Plaintiff rather than dismissing him shows, if anything, that the Defendant was reluctant to take a final adverse action. And such facts could well lead a factfinder to conclude that retaliatory animus was simply not part of the Defendant's decision-making.

That said, it is nonetheless relevant to the Court's overall *prima facie* case calculus that the record shows that Mr. Holliday did not follow up on at least some of Plaintiff's complaints of statutory discrimination, including that Mr. Buterbaugh interrogated Plaintiff about his AIDS status. (*See* Buterbaugh Dep., at 99:15–22 (testifying that he didn't recall Mr. Holliday or HR following up with him about Plaintiff's discrimination complaints).) In addition, in December 2014, Plaintiff sent an email to his supervisor complaining that he felt "extremely discriminated against" by his coworker's comment/threat to him that the two of them handle their disagreement in a "man's way." (ECF No. 64-1, at 9.) Defendant argues that this incident does not deal with Plaintiff's protected characteristics.[22] But, given Plaintiff's explicit reference to the "man's way"

---

[22] Defendant admits that Plaintiff complained that the coworker said they could settle this in "a man's way," but denies that Plaintiff claims to have said anything to Mr. Holliday other than that the coworker told him they could "take it outside." (Defendant's Response to PSMF ¶¶ 48–49.) In briefing, Defendant describes the incident as one where the coworker yelled at Plaintiff and said he did not have to take Plaintiff's "crap." (ECF No. 69, at 9.) The record shows that Plaintiff complained directly to his supervisor that he felt "extremely discriminated against regarding [the] 'mans'

comment, a jury could reasonably find that Plaintiff held an "objectively reasonable" belief that he was complaining about discrimination based on his sex, and that such complaint was thus statutorily protected conduct. *See Moore*, 461 F.3d at 341. The recipient-supervisor forwarded Plaintiff's email complaint to Mr. Buterbaugh with the following note: "Just an FYI regarding [Plaintiff] . . . I'm sure another call to HR will be involved . . . I think all involved are 'fed up.'" (ECF No. 64-1, at 9.) Mr. Buterbaugh forwarded the email exchange to Mr. Holliday, stating "FYI." (*Id.*) It is undisputed that no action was taken against the other employee and that Plaintiff did not receive any follow-up from HR or Mr. Holliday about the incident. (PSMF ¶¶ 48–49; Defendant's Response to PSMF ¶¶ 48–49.) Mr. Holliday testified that he couldn't recall this particular dispute with Plaintiff, but that a physical threat constitutes unprofessional conduct that should be reported to HR and addressed. (Holliday Dep., at 97:1–25.) While the Defendant's failure to follow up on this complaint or others does not conclusively establish a causal connection, a rational factfinder could reasonably find that such evinces a retaliatory animus.

Where temporal proximity and ongoing antagonism each separately fail on their own to establish a causal connection, one may nonetheless be shown when the allegations "looked at as a whole, may suffice to raise the inference." *Kachmar*, 109 F.3d at 176–77. As referenced, a plaintiff may establish causation through "evidence gleaned from the record as a whole" and "view[ed] with [a] wider lens." *Farrell*, 206 F.3d at 281.

The other relevant piece of evidence is Mr. Holliday's email of March 13, 2015 that complains to HR about the "issues" they had with Plaintiff. Plaintiff argues that this email supports a finding that Defendant's employment termination was retaliatory. Defendant does not discuss or

---

comment." (ECF No. 64-1, at 9.) And the record further shows that this complaint was forwarded along to Mr. Holliday. (*See id.*)

mention this email in its briefing. Three months before Ms. Corrica's allegations and four months before Plaintiff was fired, Mr. Holliday sent an email to HR Manager Szumski, in which he advised her about a complaint that a coworker made with respect to Plaintiff and forwarded her one of Plaintiff's Facebook posts that Mr. Holliday had been sent. (Holliday Dep., at 88:14–89:1.) According to deposition testimony, the email at one point references an "altercation" that Plaintiff had. (*Id.* at 90:21–24.) In his email to HR, Mr. Holliday wrote: "you know the issues we have with [Plaintiff]." (PSMF ¶ 88.)[23] The record shows that it was unusual in and of itself for Mr. Holliday to receive posts from employees' Facebook accounts. When asked in his deposition about his reference to Plaintiff's "issues," Mr. Holliday testified that Plaintiff "at times can be a very difficult individual to work with." (Holliday Dep., at 89:23–99:3.) He testified that he formed this opinion based on what other people had told him and from internal HR investigations into Plaintiff that had resulted in disciplinary warnings. (*Id.*)

One reasonable understanding of these events is that Mr. Holliday knew of and was referring to legitimate conduct and resulting disciplinary "issues" with Plaintiff and then months later he legitimately requested an HR investigation upon learning of Ms. Corrica's allegations. It would further be reasonable for a rational factfinder to believe that Mr. Holliday legitimately credited Ms. Corrica's allegations and fired Plaintiff as a result. But the record does not compel that conclusion and that conclusion only.

This is because the record is unclear as to what Mr. Holliday meant when he referred to Plaintiff's "issues." At the time when Mr. Holliday sent that email in March 2015, Plaintiff had filed three EEOC charges and multiple internal complaints about discrimination based on his sexual orientation and AIDS status. The record shows that Mr. Holliday knew of at least some of

---

[23] The actual email does not appear to be in the record before the Court, but this fact is undisputed.

this protected activity. (*See* Holliday Dep., at 33:19–36:12 (testifying that he received and knew of the first two EEOC charges after they were resolved and before Plaintiff's employment was terminated).) And Defendant does not argue that Mr. Holliday was unaware of Plaintiff's protected activity. Mr. Holliday's comment and concern about Plaintiff's unspecified "issues" a few months before Mr. Holliday made the decision to terminate Plaintiff's employment could reasonably support a finding that there is a causal link between Plaintiff's protected activity and his termination.

To be sure, this is not the strongest evidence to establish such a causal link particularly since on their own, neither temporal proximity nor an alleged "pattern" of antagonism would appear to exist sufficiently to carry the day for the Plaintiff. And the connections between these events may turn out to be simply too attenuated to convince a jury at trial that unlawful retaliation was afoot. But that is not the Court's call, and is instead one for a jury to make, as record facts considered together are nonetheless enough to support a rational jury finding of causation. *See Thomas v. Bronco Oilfield Servs.*, 503 F. Supp. 3d 276, 315, 317–18 (W.D. Pa. 2020) (concluding that a jury could rationally and reasonably conclude that an employer's remarks about the plaintiff being "so much trouble" were intended to reference the plaintiff's complaints of unlawful discriminatory misconduct or the filing of an EEOC charge). After all, the Court must draw all reasonable inferences in favor of the plaintiff and may not make credibility determinations or weigh the evidence. *See Reeves*, 530 U.S. at 151. Those are functions of the jury, not the Court.

The record supports a reasonable finding that Plaintiff's protected conduct was the likely reason for his employment termination. *See Carvalho-Grevious*, 851 F.3d at 259. As a result, the Court concludes that Plaintiff has made out a *prima facie* case of ADA and Title VII retaliation.

### *b. Pretext*

As explained above, Defendant provides a legitimate, nondiscriminatory explanation for Plaintiff's termination. That brings us to pretext. To establish pretext, the plaintiff must present sufficient evidence from which a reasonable jury could either: (1) disbelieve the employer's articulated legitimate reason; or (2) believe that an invidious discriminatory reason was more likely than not the real reason for the employer's action. *Fuentes*, 32 F.3d at 764. A plaintiff claiming ADA or Title VII retaliation must ultimately prove that his protected activity was a but-for cause of the adverse action taken against him. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013); *Keyhani v. Trustees of Univ. of Pennsylvania*, 812 F. App'x 88, 92 (3d Cir. 2020) (ADA retaliation claim); *Carvalho-Grevious*, 851 F.3d at 258 (Title VII retaliation claim). A plaintiff who proves that retaliatory animus was the "real reason" for the adverse employment action will necessarily be able to establish but-for causation. *Carvalho-Grevious*, 851 F.3d at 258 (citing *Nassar*, 570 U.S. at 346–47).

To add onto the Court's discussion above about Plaintiff's *prima facie* case of retaliation, the Court concludes that a rational factfinder could reasonably find that Mr. Holliday was not referring to Plaintiff's disciplinary history when he mentioned Plaintiff's "issues," but was instead referring to Plaintiff's repeated statutorily protected complaints, both internally and with the EEOC. Though the email referred to another employee's complaints against Plaintiff and referenced an "altercation," when asked what he meant by "issues," Mr. Holliday testified that Plaintiff was a "very difficult" person to work with. This does not resolve the "issues" question because an employer may find an individual "very difficult" to work with for the precise reason that such individual engages in protected activity. At this stage, the Court must draw all reasonable inferences in Plaintiff's favor. Doing so here would support a reasonable jury's decision to

conclude that Mr. Holliday's difficulty with Plaintiff was his protected conduct.

To prevail at trial, Plaintiff need not prove that, had he not engaged in protected activity, American Airlines never would have ever terminated his employment; he only needs to convince the jury that, had he not engaged in protected activity, American Airlines would not have terminated his employment on July 22, 2015. *See Carvalho-Grevious*, 851 F.3d at 262. Plaintiff's theory is that Mr. Holliday requested the HR investigation of Plaintiff as a pretextual cover for his retaliatory motives. It is undisputed that Plaintiff had no disciplinary action taken against him between September 10, 2014 and June 2015; his suspension stemming from Ms. Corrica's allegations was thus his first disciplinary action following the "issues" email in March 2015.[24] And even though a disciplinary warning came after the third EEOC charge, the warning pertained to an incident that occurred more than a month before Plaintiff filed the charge. A reasonable jury could thus rationally conclude that Mr. Holliday saw Ms. Corrica's allegations as his first opportunity following Plaintiff's protected activity to act on a retaliatory motive. In that sense, a reasonable jury could rationally find that but for Plaintiff's protected activity, Defendant would not have discharged Plaintiff on July 22, 2015. As with the *prima facie* case for Title VII/ADA retaliation, Plaintiff does not have the strongest of arguments that Defendant's proffered explanation for Plaintiff's discharge is pretextual. But the Court concludes that it is nonetheless strong enough to allow a reasonable jury to return a verdict in his favor on these retaliation claims.

Because on the record now before it the Court concludes that a reasonable jury could find that Defendant unlawfully retaliated against Plaintiff for engaging in protected complaints of

---

[24] It was also the first disciplinary action against Plaintiff after Mr. Holliday was forwarded an email from Plaintiff's supervisor that stated "all involved are 'fed up'" regarding Plaintiff after Plaintiff complained he felt discriminated against when a coworker threatened him to settle their disagreement "in a man's way."

disability and sex discrimination and/or the filing of his EEOC Charges, Defendant's Motion for

Summary Judgment on Plaintiff's ADA and Title VII retaliation claims will be denied.

**V.**   **<u>CONCLUSION</u>**

For the reasons listed above, this Court will GRANT Defendant's Motion for Summary

Judgment at ECF No. 52 as to Counts I, III, and V and will DENY the Motion as to Counts II and

IV. An appropriate Order will follow.

<div style="margin-left: 40%;">

<u>s/ Mark R. Hornak</u>
Mark R. Hornak
Chief United States District Judge

</div>

Dated:  August 27, 2021
cc:      All counsel of record